STEVENS ENTERPRISES, INC., *v.* STONE, CHAIRMAN, STATE TAX COMMISSION, Revived as, ALEX McKEIGNEY, CHAIRMAN, STATE TAX COMMISSION

No. 39922 February 13, 1956 85 So. 2d 461

*Wells, Thomas & Wells, Charles Clark,* Jackson, for appellant and cross-appellee.

*John E. Stone, Howard B. Trimble,* Jackson, for appellee and cross-appellant.

812

814

Gillespie, J.

Stevens Enterprises, Inc., appellant, hereinafter called taxpayer, sued the Mississippi State Tax Commissioner, hereinafter called Commissioner, for a refund of sales taxes. The declaration was in four counts, each of which will be dealt with separately.

Counts one and two of the declaration were for the recovery of payments of sales taxes made for two different periods of time between January 11, 1949, and March 1, 1953, under what will herein be called a "rental contract." There were several of these rental contracts for the vending of candy, cup drinks, etc., all of which were substantially the same and controlled the business of the taxpayer for the period January 11, 1949 to March 1, 1953. The rental contract provided that taxpayer leased certain vending machines to the United States Air Force Post Exchange at Keesler Field, herein called Post Exchange. The contracts were prepared at Keesler Field and appeared to be forms used by the United States Air Force Exchange Service. The contract, among other things, provided that the Post Exchange could cause to be removed any machine they desired and cause it to be stricken from the lease; that the vending machines were to be placed as designated by the Post Exchange; that taxpayer keep the machines in repair and maintain them in a clean, attractive and sanitary condition to the satisfaction of the Post Exchange; that taxpayer would, at its expense, keep the machines stocked with merchandise; that taxpayer and its employees were subject to the control of the Post Exchange and military regulations, but such employees of taxpayer were not to be deemed employees of the Post Exchange; that taxpayer could not employ any person to which the Post

Exchange objected; that taxpayer be required to furnish all or such parts of the merchandise for the vending machines as the Post Exchange might request, at or below prices specified by the Post Exchange; that whenever taxpayer supplied merchandise, duplicate invoices were to be furnished the Post Exchange and such merchandise was to belong to the Post Exchange from the time of delivery to them until vended in the machines; that the specific brands of merchandise to be sold was to be designated by the Post Exchange officials, together with the price at which it could be sold; that the Post Exchange had the right to buy the merchandise to be sold in the machines and deliver it to taxpayer, in which event taxpayer would be bailee of the merchandise, responsible therefor to the Post Exchange; that title to the vending machines was to remain in taxpayer and Post Exchange would provide reasonable protection against loss and pilferage; that taxpayer pay all necessary permits, license fees, taxes, and comply with all applicable laws and regulations; that taxpayer provide various forms of insurance therein specified; that taxpayer account to the Post Exchange for the retail sales value of all merchandise vended in the machines and maintain accountability records as prescribed; that taxpayer be paid a percentage of the retail sales value of the vended merchandise (80% to 87½%) for all services and as rental under the contract; that settlement was to be made as agreed, but not less frequently than once a month; that either party could terminate the contract on thirty days' notice, or for cause by the Post Exchange; that the contract was the obligation of the Post Exchange and not that of the United States Government; that the Post Exchange had a right of supervision over entire operations conducted by taxpayer under the contract and to make inspections and audits.

About 200 machines were furnished by the taxpayer under the rental contract and placed at various places

on Keesler Air Force Base as directed by the Post Exchange.

As to the retail sales made through these vending machines under the rental contract arrangement, the question is whether the sales were those of the taxpayer or the Post Exchange. The position maintained by the Commissioner is that if taxpayer had lived up to the contract there would have been no sales tax liability on its part; but that taxpayer's actual operations were such that it abandoned the contract and conducted the business in such manner, not within the terms of the contract, that the sales were actually those of the taxpayer and were taxable as such against taxpayer.

 █ Substantially, the Commissioner's position as to abandonment of the contract is based on the following facts: (1) The Post Exchange never issued checks to taxpayer for merchandise put into the machines or into the warehouse except for one time when the Post Exchange issued taxpayer a check for the inventory in the machines and after which the taxpayer, some months later, returned a check for the same amount, which amounted to a mere swapping of checks, otherwise, the operations were the same, and during which period, no tax is claimed. (2) Taxpayer kept the merchandise in a warehouse on the base until that warehouse was no longer available, and after which the taxpayer provided at its expense a warehouse off the base. (3) Taxpayer's employees were bonded in favor of the taxpayer. (4) Taxpayer made good losses to soldiers who placed coins in the machines and got no merchandise in return. (5) Taxpayer absorbed the loss from spoilage of candy or other merchandise. (6) Taxpayer stood the loss when the machine would "jackpot" because of mechanical failure and release all candy on insertion of one nickle. (7) Taxpayer stood the loss from pilferage from the machines. (8) During most of the time, taxpayer collected all the money and remitted to the Post Exchange

with the coverletter designating the remittance as "commissions" to the Post Exchange. (9) The profit and loss statements required by the Post Exchange to be furnished by taxpayer showed the amounts realized by the Post Exchange as "rental to location owners." (10) The invoices for the merchandise brought on the base read "sold on" and "delivered to" Keesler Air Force base.

Additional uncontradicted proof showed that the entire operation was under the direction and control of Post Exchange officials, and that any changes made in the operation from the terms of the contract were because of the demands of Post Exchange officials, including the method of invoicing the merchandise, the making of reports and accountability records to the Post Exchange; that orders were made and countermanded at the will of whoever was in charge of the Post Exchange at the time; that perpetual inventories were required and kept by taxpayer and daily reports made to Post Exchange of every candy bar sold in every one of about 200 machines; that the reports and records required of taxpayer were such that the Post Exchange could tell at any time the exact status of the operation to the last detail of each machine; that Post Exchange kept keys along with taxpayer to the warehouse and at times to the money boxes in the individual machines, and inventoried the merchandise in the warehouse when it desired; that as the machines were serviced, Post Exchange men could and did go with employees of taxpayer; that the Post Exchange had varying rules as to the daily handling of receipts, sometimes taking the money themselves and remitting the amount due taxpayer, and at other times, directing the taxpayer to deposit the money in the latter's account and remit the net to the Post Exchange monthly; that the Post Exchange required machines to be put in and taken out on any place on the base that it desired; that no truck

used by taxpayer could enter or leave the base except under leave of the Post Exchange; that no merchandise could be brought on the base except on authorized freight bill; that Post Exchange records showed the total retail sales as sales of the Post Exchange, with the amount paid taxpayer under the contract as the cost of sales; that the purpose of the entire operation was to be of service to the soldiers who bought all of the merchandise.

Upon consideration of the terms of the contract, we are of the opinion that enumerated factors (1) to (7) inclusive, set out above, were consistent with the terms of the contract. The matter of the cover letters showing commissions to the Post Exchange, and the profit and loss statements showing "rental to location owners", and other record evidence appear to us not to be controlling on the question of who made the sales. There is no suggestion that the contract was made for the purpose of circumventing the sales tax law with intent on the part of the taxpayer to operate contrary thereto. The record fails to show that the taxpayer stood to gain anything whatever in any deviation from the contract.

Under the terms of the contract, the sales were those of the Post Exchange, and not those of taxpayer. The Commissioner does not contend otherwise, but contends there was an abandonment of the contract in such way that the sales were those of taxpayer. We hold that there was not an abandonment of the contract by the taxpayer; that any deviation from the contract was not brought about by the taxpayer but by the Post Exchange, the dominant party thereto by the terms of the contract itself; and that such deviations from the contract shown were insufficient to effect any change in the legal status of the relationship of the parties to the contract or the sales made through the machines. The contract controlled the operation; the business done was that of the Post Exchange, the owner of the merchandise when it was vended in the machines; the income of taxpayer

was for sales service to the Post Exchange and rental on the machines; and the taxpayer was not liable for sales tax on the sales.

There was no issue of fact to be submitted to the jury, and the trial judge correctly directed a verdict for appellant, taxpayer, on counts one and two of the declaration.

▇▇▇ ▇ Count three of the declaration was for the recovery of certain taxes paid for a part of the period the taxpayer operated on Keesler Air Force Base under a "concessionaire contract," covering the period from March 1, 1953 until September 17, 1954, when the business of the taxpayer ceased because of the seizure of all of its assets under a warrant issued by the Commissioner. The concessionaire contract provided for extensive controls over the operations of the taxpayer by the Post Exchange, but it was fundamentally different from the rental contract in that taxpayer did not lease the machines to the Post Exchange. The concessionaire contract provided for the payment to the Post Exchange of a percentage of gross sales; and under it, the Post Exchange had no right to buy the merchandise to be vended, and the merchandise was the property of taxpayer until vended by the machines. Taxpayer retained all daily sales and remitted to the Post Exchange its share. Under the terms of this contract, the sales were clearly those of the taxpayer. The proof shows that there was no great change in the manner of conducting the taxpayer's business under the concessionaire contract from the manner in which the business was conducted under the rental contract; nevertheless, the taxpayer was the owner of the property when sold and we hold that the contract is binding on the taxpayer as written. The general plan of this contract was that the business of selling was the business of the taxpayer.

It is contended by the taxpayer that the relationship between the Post Exchange on the one hand and tax-

payer and his employees on the other was such that the Post Exchange was the master and taxpayer and its employees were servants. If we were reviewing the facts for the purpose of determining the liability of a master to third persons for negligent acts of an alleged servant, this contention of taxpayer would probably be valid; but in determining the question of who was making the sales under the sales tax law, all those several factors pertinent in determining whether the relationship of master and servant exists, insofar as this case is concerned, are of no particular moment. The most important factor in determining who made the sales for sales tax purposes is: Who owned the property and passed the title to the purchasers? Unquestionably under the concessionaire contract, the property was owned by the taxpayer who passed title to the purchasers from the vending machines. It is our conclusion that the taxpayer owed sales taxes on its vending machine operations under the concessionaire contract from and after March 1, 1953, and that the trial court correctly granted appellee, Commissioner, a directed verdict on this count.

We now consider the fourth and final count in taxpayer's declaration. It appears that since the early part of taxpayer's operation on Keesler Air Force Base, negotiations had been conducted between the Commissioner and taxpayer concerning taxpayer's liability for sales taxes on the operations beginning January 11, 1949. These negotations included various hearings, conferences and exchange of letters. There seems to have been some kind of informal agreement that the taxpayer would pay taxes for certain representative periods with the right to sue for a refund, including the amounts covered by counts 1 and 2 of the declaration. Taxpayer failed to pay all of the taxes supposed to have been paid under this arrangement and on September 13, 1954, the Commissioner issued against taxpayer a warrant for collection of sales taxes, directed to the Sheriff of Harrison

County, as follows: For the period January 1, 1950 to February 28, 1952—$15,196.48; March 1, 1952 to July 31, 1952, and September 1, 1952 to October 31, 1952 — $3,049.95; and for the period March 1, 1953 to October 31, 1953 — $2,838.18, or a total of $21,084.61. Pursuant to that warrant, and an alias warrant for the same amount, the Sheriff of Harrison County levied upon various trucks, vending machines, and other property of the taxpayer, garnished its bank account, and the State Tax Commission realized from the Sheriff pursuant to said tax warrant the sum of $14,784.22. Taxpayer alleged that the warrant was illegally issued and illegally executed, and that the value of the property sold was $44,784.22, and that it should recover either the $44,784.22 or the total amount of the tax warrant claimed, or the total amount actually received by the Tax Commission, being $14,784.22. The circuit judge struck out that portion of the fourth count seeking recovery of the value of the property or the amount shown as being claimed by the Commissioner to be due at the time of the issuance of the warrant, but declined to strike that portion seeking to recover the $14,784.22 actually received by the Commissioner pursuant to the warrant. No error is assigned as to the action of the lower court in striking a portion of count four of the declaration as stated.

██ ██ From what has already been said herein, appellant owed no taxes for sales prior to March 1, 1953, and prior to the issuance of the warrant, taxpayer had paid in the amounts recoverable under counts one and two, the total amount of which about equaled the amount claimed in the tax warrant for unpaid taxes due under the concessionaire contract for business done thereunder after May 1, 1953. As to all amounts claimed by the Commissioner in the warrant for business done before March 1, 1953, no tax was owing, and the warrant therefor was unlawfully issued.

The Commissioner urges that taxpayer may not recover the amount of taxes realized by the Commissioner under the tax warrant for the reason that taxpayer failed to take advantage of its administrative and judicial remedies to secure a refund of taxes paid and cannot contest its liability in the premises after permitting judgment to be entered against it. We understand the Commissioner's position is that a suit for refund cannot be maintained unless the tax is paid, and that collection under a warrant is not payment by the taxpayer; that the Warrant for collection of sales tax has the force and effect of a judgment and is res judicata.

Sections 10123, 10124 provide in part: "Any person improperly charged with any tax imposed by this act, *and required to pay the same,* may recover the amount paid together with interest, in any proper action or suit against the Commissioner for the amount paid into the State Treasury. . . ; and the circuit court of Hinds County, or of the county of the taxpayer's residence or place of business, shall have original jurisdiction of any action to recover any tax *improperly collected* by the commissioner, and paid into any fund in the State Treasury. . . . . It shall not be necessary for the taxpayer to protest against the payment of the tax or to make any demand to have the same refunded in order to maintain such suit. . ."

The statute authorizes recovery by any person who has been required to pay taxes improperly charged against him, or, as otherwise stated, any tax improperly collected by the Commissioner. This includes taxes illegally collected by the Commissioner by means of the issuance of a warrant under Code Section 10125. In this case if taxpayer had paid the taxes improperly claimed by the Commissioner there would have been no question as to the taxpayer's right to recover in a suit for refund.

██ ██ We are here concerned with taxes illegally collected. The argument of the Commissioner amounts to this: Taxpayer A is illegally assessed with sales taxes and he pays before a warrant is issued, and he is entitled to recover such taxes in a suit therefor; but when Taxpayer B is illegally assessed with sales taxes he fails or refuses to pay either because he does not have the money, or for some other reason, and a warrant is issued and executed by means of which the taxes are collected, then B cannot recover for the reason that he did not pay the taxes. The statute does not so provide. It would be manifestly unjust for us to deny the recovery of taxes illegally collected by means of a warrant. As far as the right to recover is concerned, taxes improperly collected from the taxpayer may be recovered whether the payment is made before warrant is issued or by means of the warrant. The statute imposes these burdens on a person before he can recover: (1) The taxes must have been improperly charged and the taxpayer required to pay same; (2) the plaintiff must allege and prove that he alone bore the burden of the tax sued for, and did not directly or indirectly collect the tax from his customers; and (3) the suit must be filed within three years from the time the return was filed or from the time the assessment was made. It is not necessary that the taxpayer protest against the payment of the tax or to make any demand to have the same refunded in order to maintain the suit. The taxpayer in this case brought itself squarely within the provisions of the statute.

██ ██ Under the Mississippi Sales Tax Act, a tax warrant is not the same as a judgment at law, although it does have the effect of a judgment as a summary method of collecting taxes. It is not a judgment in the sense that it is res judicata on the question of liability of the taxpayer.

Appellant relies on the case of people v. Skinner (Cal.), 115 Pac. 2d 488. That case arose out of a motion to set aside and vacate a judgment entered under the California statutes for the collection of sales and use taxes. The principal question for determination in that case was whether or not the notices provided by, and given pursuant to, the California statutes were in harmony with constitutional requirements of due process of law.

The California statute provides for certain administrative procedures for the assessment of sales and use taxes, and if the taxpayer fails to file a petition for reassessment within a certain period of time, the assessment becomes final. It also provides for a hearing by the Board of Equalization. The act also makes provision for resort to a judicial tribunal for a consideration and determination of the question whether there was an abuse of discretion on the part of the Board. Instead of following the procedure required by the California statutes, the taxpayer sought to have vacated the judgment that had become final because of his failure to take the steps necessary to entitle him to a judicial determination of his case. The California statutes are different from those of this State, both as to the finality of the administrative assessment of the taxes and the requirements as to suits for refund of taxes. The case of People v. Skinner, supra, is not applicable. For substantially the same reasons the other cases from other jurisdictions cited by the Commissioner are not in point.

The lower court should have directed a verdict for the taxpayer under count four for the sum of $14,784.22, less the sum of $2,838.18, which was due under the concessionaire contract for business done after March 1, 1953.

Taxpayer assigned as error the failure of the lower court to give judgment for interest. The statute provides for the recovery of interest. Interest was not

demanded for any period prior to filing suit, and we do not consider whether interest is recoverable between the date the State received the taxes and the filing of the suit. Interest is recoverable from and after the date suit was filed, and it is so ordered.

We deem it unnecessary to discuss other assignments of error made by the parties, all of which have been duly considered.

Affirmed in part and reversed in part on direct appeal; affirmed on cross-appeal.

All justices concur, except Kyle and Holmes, JJ., who took no part.